UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JACQUELEN MARSHALL,

                                              DECISION

                    Plaintiff,               and ORDER


vs.                                          12-CV-6401T


CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____


## INTRODUCTION

Plaintiff, Jacquelen Marshall ("Marshall" or "Plaintiff"), brings this action pursuant to the Social Security Act § 216(i) and § 223, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence in the record and is contrary to applicable legal standards. On July 9, 2013, the Commissioner moved for judgment on the pleadings pursuant to 42 U.S.C. § 405 (g) on the grounds that the findings of the Commissioner are supported by substantial evidence. On August 4, 2013, Plaintiff cross-moved for summary judgment seeking to reverse the Commissioner's decision.

For the reasons discussed below, Plaintiff's motion is granted

in part, Defendant's motion is denied, and the matter is remanded for further administrative proceedings.

## PROCEDURAL HISTORY

On November 19, 2008, Plaintiff filed concurrent applications for DIB and SSI under Title II, § 216(i) and § 223 of the Social Security Act, alleging a disability since December 27, 2006 arising from lower back and left leg pain. T. 118-125, 154. Plaintiff's claim was denied on March 30, 2009. T. 64-68. At Plaintiff's request, an administrative hearing was conducted on June 24, 2010 before an Administrative Law Judge ("ALJ") at which Marshall testified and proceeded *pro se*. A vocational expert also testified. T. 9-37.

On July 26, 2010, the ALJ issued a Decision finding that Marshall was not disabled. T. 40-50. On June 1, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's Decision the final decision of the Commissioner. T. 1-4. This action followed.

## BACKGROUND

Plaintiff is a 48 year old woman with a ninth grade education. T. 118, 19. She first experienced pain in her back on December 27, 2006. T. 151. Marshall described her pain as stabbing or dull ache in the lower back which radiates down to the outside of her left leg and

she has no feeling to the touch from her knee down the shin. T. 151. Marshall claimed that the knee goes out without notice at times. T. 151.

Marshall's work history was in customer service in the retail industry. T. 162. She worked for a variety of employers from 1991 through 2006 in retail which required either no lifting or lifting less than 10 pounds. T. 162.

In her disability application, Marshall noted that she was able to take care of herself including preparing meals but it was taking longer to do so than it used to before her injury. T. 145. Plaintiff shopped for her own groceries and could do light cleaning although at times she relied on the help of her mother or friends. T. 146. Prior to her injury, Plaintiff enjoyed running, playing sports, hiking and sewing. T. 147.

A. <u>Medical History</u>

Plaintiff began treatment for back pain in December, 2006. Lumbar spine x-rays taken showed no spondyloishthesis, no visible fracture and normal bone mineralization. T. 341. No degenerative changes were seen. In the left hip, no cortical irregularity or trabecular disturbance was seen. T. 341. The impression noted in the record was "normal examination of the lumbar spine and left hip." T. 341.

Plaintiff was treated at the neurosurgery clinic at Strong Memorial Hospital of University of Rochester for her left lower extremity pain on May 4, 2007. T. 219. Plaintiff was taking Vicodin on occasion for pain which she reported worked well. T. 219. Her pain episodes were intermittent, occurring approximately once per day. T. 219. The MRI showed L1 and L2 herniated disc. Dr. Robert Bakos indicated that the herniation could be the cause of some of the left leg symptoms, it was not consistent with sciatic and pain distribution. T. 220. He recommended a series of epidural steroid injections with Dr. Markman of the pain clinic. T. 220. He also suggested Plaintiff stop physical therapy as Plaintiff indicated it was making the pain worse. T. 220.

In a letter dated June 29, 2007, Dr. Markman of the University of Rochester Neuromedicine Pain Management Center detailed his treatment of Marshall. T. 191-192. He noted that Plaintiff had left sided leg pain in the posterior hamstring most consistent with radiculitis. T. 192. Dr. Markman pointed out that there was a "poor correlation" between the L1-L2 lesions on Plaintiff's MRI and the location that she has the pain. During his examination, Dr. Marman found Plaintiff to have a full range of motion at the lumbar spine with flexion and extension. There was no significant pain reproducible with direct palpation of the paraspinal muscles or the spinous processes. T. 192. Similarly, there was no reproduction of

pain with lumbar extension, rotation and focal tenderness over the S1 joint or greater trochanteric bursa. T. 192. Although his examination of Plaintiff showed no motor or sensory deficits, Plaintiff expressed pain with straight leg testing. He recommended epidural steroid injections for radiculitis. T. 192. He points out that there were no features of lumbrosacral pleopathy and no significant hamstring weakness. T. 192.

Dr. Markman next examined Plaintiff on September 24, 2007. T. 194. He noted that interventional pain management with lumbar epidural steroid injections at L4-L5 and left sacroiliac joint were ineffective in reducing Plaintiff's pain. T. 194. Plaintiff told Dr. Markman that taking Tramadol as needed for pain was helpful. T. 194. She indicated that standing for any length of time provoked left buttock and thigh pain. Dr. Markman found no tenderness with palpation of the thoracic or lumbar spine nor muscle atrophy or wasting in the lower extremities. T. 194. He recommended repeating the lumbar epirdual steroid injection at L1 and requested further MRI studies of the pelvic floor to rule out structural source of the pain. T. 194.

Dr. Markman's medical notes of October 30, 2007 reflect that Plaintiff discontinued all medications except Tramadol since her last appointment of September 24, 2007. T. 196. She was walking for exercise wearing ankle weights and stopped smoking. T. 196.

Dr. Markman noted that Plaintiff had no tendernes with palpation of the spinous processes of the thoracic or lumbar spine or of the myofascial structures of the back. T. 197. He observed Plaintiff walk with a steady upright posture. T. 197. Dr. Markman concluded that the examination showed no evidence of focal neurologic deficit, that the MRI of the pelvis showed no structural abnormality and he scheduled a lumbar epidural steroid injection targeting S1 to treat the left buttock and posterior thigh pain. T. 198.

Plaintiff called into Dr. Markman's office on January 16, 2008, one week after receiving the injection, and reported that she had been feeling ill. T. 199. Plaintiff reported taking Tradadol twice within the last three weeks and indicated that she was trying to get off all medications. T. 199. Dr. Markman's office adviced her to come in for evaluation. T. 199.

Plaintiff was examined by Dr. Vythilingam Alagappan on February 29, 2008 for complaints of headaches that were severe and getting worse. T. 239. Marshall reported that she was taking Motrin which helped. T. 239. Plaintiff was advised to quit smoking and given Toradol injection. T. 240. She was advised to use Excedrin migrain medications and given some samples of Axert tablets as well as a prescription for Chantix for smoking cessation. T. 241.

Dr. Alagappan examined Plaintiff again on March 25, 2008 for follow up weight loss treatment and diabetes evaluation. T. 238. Plaintiff reported that she was feeling "overwhelmed" as she was not successful in securing a job and had bills piling up. T. 238. She reported having back and leg pain at times. T. 238. Marshall felt depressed and wanted to try to go back on medications. Plaintiff was diagnosed with back pain, generalized anxiety disorder, pain in the back of the left thigh and smoking. T. 238. Dr. Alagappan recommended Plaintiff receive counseling for depression, advised her to seek further employment opportunities, and given a prescription for Celexa for anxiety. T. 239. Plaintiff insisted on a prescription for Xanax and she was given that as well. T. 239.

Dr. Markman gave Plaintiff an interlaminar lumbar epidural steroid injection at Level L4 on April 23, 2008. T. 237. On May 22, 2008, Plaintiff was treated for wrist pain resulting from an injury incurred when Plaintiff tried to open a jammed door. The wrist was swollen and painful. T. 236-7. There was no fracture and Plaintiff was advised to use a splint and use ice or heat to reduce swelling. T. 237. At a follow up appointment on June 4, 2008, Plaintiff complained of continued wrist pain. T. 234. She was advised to do some hand exercises and take anti-inflammatory measures. T. 235. Dr. Alagappan continued Plaintiff on "small doses" of anti-anxiety medication. For her back pain, Dr. Alagappan suggested Plaintiff do

some exercises, and use local heat and topical analgesics. T. 235. He specifically reassured Plaintiff that she had no nerve impingement but that she should watch out for "red flags" such as "pain radiating from the back all the way down to the foot, especially upon coughing or sneezing." T. 235. Plaintiff received injections for continued pain in her wrist in July and August, 2008. T. 230-231.

Plaintiff was treated by Unity Health System Physical Therapy and Rehabilitation on July 8, 2008 and August 1, 2008. T. 205-06. Plaintiff reported that the injections gave her "good relief". T. 205. Plaintiff was noted to have less pain and making good progress on August 1, 2008. T. 206. Marshall was discharged from physical therapy on August 15, 2008 after she had not been treated nor called for an appointment in over two weeks. T. 207.

At her physical examination on August, 29, 2008, Plaintiff reported that after some back pain relief, it had returned. T. 228. She also was upset that she lost a temporary job. T. 228. Plaintiff asked her doctor for Vicodin and she continued on Xanax for anxiety. T. 228.

Plaintiff presented to the emergency department with sharp pain in the back and fever. She was treated for a kidney infection. T. 289. A CT scan of the abdomen and pelvis taken on October 18, 2008 for evaluation of a renal abscess showed no evidence of renal abscess

nor renal calculus or hydornoephrosis. T. 247. She was given the antibiotic Cipro and Lortab and discharged. Dr. Alagappan examined Plaintiff on October 21, 2008 as a follow up. T. 289. He advised her to finish the seven day course of Cipro and to return for a follow up in three months. T. 290.

Dr. Alagappan examined Plaintiff on October 28, 2008 as a follow up for back pain. T. 286. Plaintiff reported intense pain in the back and going through the left hip and knee down to the left foot. T. 286. Marshall was given a Toradol injection and advised to start on Vicodin and Flexeril. T. 287. She was referred to an orthopedic spine team and told to do physical therapy exercises at home. T. 287.

Marshall was seen on an emergency basis at Dr. Markman's office on November 5, 2008 after she was in severe pain radiating from the left buttock to the left anke. T. 200. She described the onset of this back and leg pain starting on October 18, 2008 when she was getting out of her truck. T. 200. Plaintiff went to the emergency room, was diagnosed with pyelonephritis and treated with antibiotics. On November 4, 2008, Plaintiff presented to the emergency room and was treated with IV Dilaudid, Toradol and provided with a prescription for Vicodin. T. 200. At this follow up examination with Dr. Markman, Plaintiff reported pain to the ankle and weakness of the left lower extremity. T. 200. She no longer was taking hydrocodone because she found it ineffective in alleviating the pain. T. 200.

Dr. Markman noted that Plaintiff's motor strength was full in the right lower extremity but the exam on the left was limited by pain. T. 200. Dr. Markman opined that Plaintiff's persistent low back pain radiating in an L5 dermatomal pattern suggested an L5 radiculitis. T. 201. He recorded that Plaintiff's degree of discomfort and postitive straight leg raises were suggestive of recurrent disk herniation. T. 201. He recommended another MRI of the lumbrsacral spine and prescribed oxycodone and gabapentin for pain. T. 201.

Dr. Markman again examined Plaintiff on November 10, 2008. T. 203. Plaintiff reported difficulty putting on socks and moving over the prior 6 weeks. T. 203. Dr. Markman noted that the MRI of the lumbar spine showed upper lumbar L1-L2 disk herniation but no lower lumbar lesion. T. 203, 281. There was focal weakness observed in the left lower extremity and there was pain limited restricted activation range of motion at the left hip. T. 203. Dr. Markman referred Plaintiff to Dr. Kevin Walter to evaluate Marshall as the articulation of pain in the lower back was atypical for a high lumbar lesion. T. 203. He continued Plaintiff on her analgesic medications. T. 203.

Nerve conduction studies performed on November 24, 2008 were normal. T. 221, 340.

Dr. Kevin Walter of the Neurosurgery Clinic of Strong Health examined Plaintiff on December 16, 2008 for back and leg pain. T. 330. Marshall described her pain as centered in the left buttock and expressed that she had difficulty with the left leg giving out at times and that she was not able to bend forward at all. T. 330. She was taking Tramadol and Endocet. T. 330. Dr. Walter was unable to perform the range of motion testing on Plaintiff's lumbar spine as she refused to bend forward or extend at all. T. 331. She also refused any type of lateral bending. Dr. Walter noted that although Plaintiff claimed that moving forward at all caused her "excruciating pain" she was able to "move relatively easily throughout the office when she was being directly observed." T. 331. The MRI showed mild to moderate spondylosis and disk hernation at L1-L2. There was no significant central canal stenosis and no lateral recess stenosis. Dr. Walter observed that "her spine looks pretty good." T. 331. He specifically saw no anatomic lesions which could be attributable to her pain. He would not recommend operating on the L1-L2 because he did not think it was the cause of her pain. T. 331. He suggested getting nerve conduction studies to see if there was nerve compression elsewhere. T. 331.

Dr. Walter completed a New York State form for disability screening on December 17, 2008. T. 154-155. In the report, Dr. Walter opined that Plaintiff was "very limited" in her ability to walk,

stand, sit, lift, carry, push, pull, bend and climb stairs. T. 154. He found no evidence of limitations for seeing, hearing, speaking, using hands, understanding and remembering instructions, carrying out instructions, maintaining attention, making simple decisions, interacting appropriately with others, maintaining socially appropriate behavior, maintaining basic standards of personal hygiene and grooming and able to function in a work setting at a consistent pace. T. 154. Dr. Walter specified that he treated Plaintiff one time and that he did not expect any of these limitations to last more than 90 days. T. 155.

A Physical Residual Functional Capacity Assessment was completed on March 26, 2009 by D. Bush. T. 342-347. Plaintiff was found to be able to occasionally climb stairs or ladders, stoop, and crouch and to frequently be able to stoop, kneel and crawl. T. 344. The assessment found no manipulative, visual, communicative, or environmental limitations. T. 345.

A letter dated July 29, 2010 from Dr. Markman indicated that Marshall had no reduction in pain following a trial of medial branch blocks for her low back pain. T. 358. She was referred for acupuncture. T. 358.

B. <u>Plaintiff's Hearing Testimony</u>

Marshall testified that she was unable to work because she could not stand or sit for long periods of time due to pain from a sciatic nerve which affected her lower left back and left leg. T. 23. She found driving in a vehicle to be particularly aggravating to her condition. T. 23. She considered her pain to be 8.5 or 9 on a 10 point scale and requires her to be bed bound some days. T. 23. At the time of the hearing, Plaintiff was taking Hydrocodone, Tramadol and Xanax for anxiety and an anti-depressant medication. T. 24. She believed that the medications have affected her vision, judgment and sugar levels which have fluctuated. T. 24. Marshall claimed that her doctors restricted her from heavy lifting, walking long distances and advised her to elevate her leg as much as possible. T. 25.

Plaintiff lived by herself in a mobile home and was able to do her own laundry and take care of her own personal needs. T. 19. On a typical day, Plaintiff woke up early, showered and did some home physical therapy. T. 26. Marshall prepared meals. T. 27. She took care of housework but used the help of her mother for running the vacuum cleaner. T. 28. She found that she must sit and stand at will to alleviate the pain. T. 31. Plaintiff claimed to be able to pick up and carry up to six pounds. T. 31. Plaintiff has a driver's license but does not drive long distances. T. 19. Marshall testified that she

uses a cane sometimes if her pain is great but that it was not prescribed by a physician. T. 20-21.

Plaintiff worked sporadically since her alleged onset date of December 27, 2006. T. 21. She worked approximately seven months in 2009. T. 22. First, Marshall worked from May 5, 2009 through July, 2009, for Advanced Auto parts as part time counter help, delivery person. T. 21. All of Plaintiff's work experience has been in retail sales including grocery, clothing and watch and jewlery repair. T. 22. She stopped working in 2009 because she felt she could not give 100 percent due to pain. T. 22.

C. <u>Vocational Expert Testimony</u>

A vocational expert testified that a hypothetical individual with the same age, education and work experience as Plaintiff who could perform sedentary, unskilled work, can occasionally perform postural movements and needs to alternate position every 30 to 40 minutes, could not do Plaintiff's past relevant work. T. 34. However, such a hypothetical individual could perform work as a telephone quotation clerk, a table worker or surveillance monitor. T. 34. The vocational expert testified that even if the individual needed to change position at will, it would not affect the ability to perform these jobs. T. 35. However, if the individual needed to miss

three to four days of work each month, it would eliminate all jobs.
T. 35.

## DISCUSSION

### I. Scope of Review

Title 42 U.S.C. §405(g) directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). The Court's scope of review is limited to determining whether the Commissioner's findings were supported by substantial evidence in the record, and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim. Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983).

Judgment on the pleadings pursuant to Rule 12(c) may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that the plaintiff has not set forth a plausible claim for relief,

judgment on the pleadings may be appropriate. see generally Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

II.   Analysis of the ALJ Decision

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  In doing so, the ALJ followed the Social Security Administration's five step sequential analysis evaluating disability benefits. (Tr. 12-18)  The five step analysis requires the ALJ to consider the following: 1) whether the claimant is performing substantial gainful activity; 2) if not, whether the claimant has a severe impairment which significantly limits his or her physical or mental ability to do basic work activities; 3) whether the claimant suffers a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment(s) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled; 4) if not, the ALJ next considers whether the impairment prevents the claimant from doing past relevant work given his or her residual functional capacity; 5) if the claimant's impairments prevent his or her from doing past relevant work, whether other work exists in significant numbers in the national economy that accommodates the claimants residual functional capacity and vocational factors, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

Under step one of the process, the ALJ found that the Plaintiff had not engaged in substantial gainful activity at any time during the period from her alleged onset date of December 27, 2006. T. 45. The ALJ next found that the Plaintiff suffered from the severe impairment of a back disorder. T. 46. At step 3, the ALJ found that Plaintiff's impairments did not meet or medically equal the listed impairments in Appendix 1, Subpart P. T. 18. T. 47. Further, the ALJ found that Plaintiff had the residual functional capacity to perform the full range of sedentary work except that Plaintiff is limited to unskilled work, can occasionally perform postural movements and needs to alternate position every 30 to 40 minutes. T. 47. The ALJ next determined that Plaintiff was not able to perform her past relevant work. T. 48. Finally, the ALJ determined that considering Plaintiff's age, education, past relevant work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform. T. 49.

Plaintiff argues that the ALJ erred by: 1)failing to find severe mental impairments; 2)failing to properly evaluate the medical evidence in establishing the Plaintiff's residual functional capacity; 3) failing to properly evaluate Plaintiff's credibility; and 4) relied on invalid vocational expert testimony.

A.   Determination Regarding Plaintiff's Affective Disorders

Marshall argues that remand is required because the ALJ failed to develop the administrative record relating to her mental impairments, anxiety and depression. She claims that because she was a *pro se* claimant, the ALJ had a heightened responsibility to develop the record fully and fairly with respect to her treatment for anxiety and depression.

A claimant in a claim for SSI or DIB bears the burden of establishing that he or she has a medically determinable impairment that precludes the performance of substantial gainful activity. *See, 20 C.F.R. § 404.1512(a)*; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). However, when a claimant appears at his or her hearing before an ALJ without representation, the ALJ has a heightened duty to assist Plaintiff with developing the record by "scrupulously and conscientiously" probing and exploring "for all relevant facts." *See*, Thompson v. Sullivan, 933 F.2d 581, 585-586 (7th Cir. 1991).

In evaluating the severity of a mental impairment, the claimant's limitations in four broad functional areas are rated along a five-point scale ranging from no limitation to extreme limitation. The four areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. A ranking of no or "mild" limitation

in all of these areas would generally warrant a finding that the claimant's mental impairments are not severe. <u>Rosado v. Barnhart</u>, 290 F.Supp.2d 431, 437 (S.D.N.Y. 2003).

In making the finding that her mental impairment of anxiety was not severe, the ALJ rated the degree of functional limitation resulting from Plaintiff's anxiety to determine whether it is "severe". The ALJ noted that Marshall had no more than mild limitation in any of the first three functional areas and no episodes of decompensation, he concluded that there were no mental impairments that were severe.

There is substantial evidence in the record to support this conclusion. With regard to the area of daily living, Plaintiff was able to complete personal care activities, cook meals and grocery shop occasionally. T. 46. The ALJ noted that Plaintiff herself attributed any limitation of activities to her physical impairment. In the area of social functioning, Plaintiff again attributed any limitations in socializing to her physical impairments. T 46. The ALJ also found that Plaintiff had no limitation with concentration, persistence or pace relying on the consistent references in medical records that indicate that Plaintiff was alert, appropriately answered questions and well oriented. Finally, there were no episodes of decompensation.

Although the ALJ did not specifically mention depression in his analysis of the severity of Plaintiff's mental impairments, the same analysis would apply to depression as anxiety. There were remarkably few references to depression in Plaintiff's medical records. The only mention in the medical records of major depression was on March 25, 2008, when Dr. Alagappan noted that Plaintiff had major depression directing her to counseling. T. 239. However, all subsequent references to depression indicate that Plaintiff did not have major depression. For example, on July 1, 2008, Dr. Alagappan specifically found that Plaintiff had "no depression." T. 233. On August 29th, 2008, Dr. Alagappan noted that Plaintiff had no depression but possibly "reactive depression". T. 230, 302, 303. He pointed out that Plaintiff did not want any medications. T. 230, 302-303.

The ALJ "must 'adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered' and by 'scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts.'" Moran v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009), *quoting*, Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a

benefits claim." <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 n. 5 (2d Cir. 1999).

This record contains various medical reports from not only Plaintiff's primary physician but from all her treating specialists. Furthermore, during the hearing on Marshall's disability claim, the ALJ elicited testimony from Marshall on any emotional or mental problems. T. 26. Marshall answered that the only emotional issue she had was anxiety. She did not mention depression at all. T. 26.

B.  <u>Evaluation of the Medical Evidence</u>

Plaintiff next contends that the ALJ failed to properly evaluate the medical evidence in determining the Residual Functional Capacity ("RFC"). Specifically, she contends that the ALJ erred by failing to develop the record with an RFC assessment from Plaintiff's treating physicians.

It is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding. <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999); <u>McClaney v. Astrue</u>, 2012 WL 3777413 (E.D.N.Y. Aug. 10, 2012). Where a treating physician has not assessed a claimant's RFC, the ALJ's duty to develop the record

requires that he *sua sponte* request the treating physician's assessment of the claimant's functional capacity. <u>Myers v. Astrue</u>, 2009 WL 2162541 (N.D.N.Y. July 17, 2009); <u>Felder v. Astrue</u>, 2012 WL 3993594 (E.D.N.Y. Sept. 11, 2012). (Commissioner has affirmative duty to request RFC assessments from plaintiff's treating sources, despite otherwise complete medical history); 20 C.F.R. § 404.1513.

I find that the ALJ neglected to develop the record by gathering treating sources' opinions on how Plaintiff's impairments affected her ability to perform work-related activities. Although the record contained extensive medical documentation, it lacked any statement from Plaintiff's treating physicians, namely Dr. Alagappan or Dr. Markman, regarding her functional abilities to work despite her impairments. Indeed, the only opinion from a treating source about Plaintiff's ability to sit, stand, walk, reach, push, pull, bend, climb, and lift was from Dr. Walter who only examined Plaintiff once. Since the ALJ had nothing more than treatment records and two functional capacity reports to review, one from a consultative examiner and the other from Dr. Walter, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC.

Moreover, because Plaintiff was *pro* se, the ALJ had a heightened duty to develop the record. <u>Echevarria v. Sec'y of Health & Human</u>

Serv., 685 F.2d 751, 755 (2d. Cir. 1982) (stating that the ALJ has a heightened duty "'"to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts"'" with *pro se* claimants). The ALJ should have advised Plaintiff to supplement her medical records with a treating physician's opinion on her functional capabilities or have contacted her treating sources personally to obtain an RFC assessment. *See,* Myers, 2009 WL 2162541 (stating that "it was incumbent upon the ALJ to encourage plaintiff to obtain an opinion from her treating physicians. In the alternative, the ALJ should have attempted to obtain an opinion directly from [her treating physicians]" citing Brathwaite v. Barnhart, 2007 WL 5322447, at * 12 (S.D.N.Y. 2007)). The ALJ's failure to develop the record with medical opinions from Plaintiff's treating sources undercut his ability to adequately determine Plaintiff's RFC adequately.

Because further development of the record may affect the ALJ's determinations regarding Plaintiff's credibility and capability, Plaintiff's remaining arguments need not be considered at this time.

On remand, the ALJ is directed to obtain, either through counsel or directly, opinions regarding Marshall's functional limitations from Dr. Alagappan and Dr. Markman and any other medical source who treated her on more than one occasion for her severe impairment of back disorder.

**CONCLUSION**

For the foregoing reasons, this Court finds that the Commissioner's denial of DIB and SSI was erroneous as a matter of law and not based on substantial evidence. The Court accordingly grants Plaintiff's Motion for Judgment on the Pleadings (Dkt #11) to the extent that the Commissioner's decision is reversed and the matter is remanded for further administrative proceedings consistent with this Decision and Order. Defendant's Motion for Judgment on the Pleadings (Dkt. #9) is denied.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
Honorable Michael A. Telesca
United States District Judge

DATED:    October 30, 2013
          Rochester, New York